24CA1163 Cadgene v State of Colo 04-10-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1163
San Miguel County District Court No. 21CV30013
Honorable Keri A. Yoder, Judge

M.J. Cadgene, a/k/a Marie Jeanne Cadgene,

Plaintiff-Appellee,

v.

State of Colorado, by and through the State Board of Land Commissioners,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE BERNARD*
Schock and Hawthorne*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 10, 2025

JVAM PLLC, Benjamin M. Johnston, Alexander C. Clayden, Quentin H. Morse, Glenwood Springs, Colorado, for Plaintiff-Appellee

Philip J. Weiser, Attorney General, D. Edgar Hamrick, Senior Assistant Attorney General, Christian D. Aggeler, Senior Assistant Attorney General, David C. Cooperstein, Senior Assistant Attorney General, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Defendant, the State of Colorado, by and through the State Board of Land Commissioners, which we shall call "the board," appeals the trial court's decision granting plaintiff, M.J. Cadgene, a/k/a Marie Jeanne Cadgene, whom we shall call "the lessee," an easement by estoppel to continue using a road running through school trust property.

## I.    Background

¶ 2    The board and the lessee own adjacent parcels in San Miguel County, which we shall call "the county."  We shall refer to these parcels as the "school trust parcel" and the "lessee's land," respectively.  Both contain steep, rugged, mountainous terrain at their edges, although each one also encompasses some terrain that could more easily be developed.

¶ 3    The lessee first leased the school trust parcel in 1986, which she used for agricultural and grazing purposes.  Each agricultural lease for the school trust parcel had a ten-year term, the most recent of which began in 2014.  Every lease that she signed stated that the board reserved the right to cancel the lease as to all or to part of the school trust parcel if it gave the lessee written notice twelve months ahead of the cancellation.

1

¶ 4    The road that is the core of the dispute in this case, which we shall call the "trust parcel road," runs through the middle of the school trust parcel. According to a report of improvements that the lessee filed with the board in 1994, the people who had leased the school trust parcel before the lessee had built the trust parcel road, perhaps starting as early as the 1890s and finishing up in the 1930s. The lessee has been using the trust parcel road since she leased the school trust parcel, and it is the only way that she can drive to the residence on her land.

¶ 5    Fall Creek and the canyon containing it run adjacent to a portion of the steep and mountainous terrain on the lessee's land. On the side of the canyon opposite her land, there is a second road in this story, which is called Fall Creek Road. A bridge was built over Fall Creek to the lessee's land in the early 1980s, but flooding washed it away about a year later, and no one has tried to rebuild it. Fall Creek Road does not provide access to the lessee's land near to where she built her improvements, including her residence.

¶ 6    In 2003, the lessee asked the county for a permit to alter the driveway to her residence on her land and to improve the trust parcel road.

¶ 7    Christopher Page was the district manager for the board's school trust property from 1999 to 2019 in the part of Colorado where the school trust parcel and the lessee's land are located. He wrote a letter to the county on the board's behalf. The letter gave the board's permission for the lessee to improve the trust parcel road so that construction vehicles could use it to reach the lessee's land, where she planned to build some structures. The county approved the application.

¶ 8    Between 2003 and 2012, the lessee built several structures, including her residence, on her land. In 2003, the lessee requested a building permit from the county to build one of these structures. A person in the planning department asked her to supplement her application with a description of alternative legal access options to her land besides the trust parcel road. The lessee gave two, including one from Fall Creek Road and the second from a vacant piece of property that also abuts the lessee's land, which we shall call "the Lot 97 easement."

¶ 9    She added in the building permit request that, in 1994, her attorney had prepared a "Notice of Establishment of Public Road" for the trust parcel road in case the board changed its mind about

allowing her continued access to that road. But she had decided, at least for the time being, not to exercise that option. Her paperwork also referred to a "perpetual easement" to the trust parcel road that would give her alternative legal access to her land should the board "rescind" her access via that road.

¶ 10    After the county approved her request to improve the trust parcel road, the lessee modified it by adding gravel and culverts and by enlarging it. These modifications added value to the school trust parcel because they reduced the prospect that the road would erode and deteriorate. The board was aware of the improvements.

¶ 11    Throughout the many years of her lease, the lessee regularly met with the board's district manager of the local school trust property. She met with one district manager from 1986 to 1999, and Mr. Page succeeded him in 1999. The district managers would drive on the trust parcel road to meet with her on the school trust parcel or on her land. For the entire time that the lessee leased the school trust parcel, the board, through the district managers, expressed great satisfaction with her care of the trust parcel. They did not give her any indication that her lease might not be renewed in the future.

¶ 12     But all that changed in the fall of 2019 after Mr. Page was no longer the district manager.  The board sent the lessee a letter informing her that it was considering selling the school trust parcel.  As a result, her lease might not be renewed and her access to the trust parcel road would therefore end.  Then, in November 2020, the board sent the lessee a letter telling her that it was selling the school trust parcel, that her lease for the parcel would be terminated, and that the board's permission for her to use the trust parcel road had been revoked.

¶ 13     The lessee filed this lawsuit in June 2021.  She asserted three claims, asking the court to declare that (1) the trust parcel road was a public road; (2) she had an easement by necessity in that road; or (3) she had an easement by estoppel in that road.  The court granted the board's motion to dismiss the first and second claims.  After a bench trial, the court issued a detailed, well-reasoned order declaring that the lessee had an easement by estoppel in the trust parcel road.

## II.   Discussion

¶ 14     On appeal, the board contends that there are three reasons why the court erred when it declared that the lessee had an

easement by estoppel in the trust parcel road. First, the lessee did not rely and could not reasonably rely on Mr. Page's representations about her access to that road. Second, the board's constitutional and statutory authority barred the claim. Third, section 24-10-106, C.R.S. 2024 (version effective until Jan. 1, 2025), of the Colorado Governmental Immunity Act barred the lessee's claim. As we explain below, we disagree with each of these contentions.

### A. Relevant Law and Standard of Review

¶ 15 "An easement by estoppel is an equitable remedy," and "Colorado law has repeatedly recognized this equitable right." *Lobato v. Taylor*, 71 P.3d 938, 951 (Colo. 2002). We will not overturn a trial court's decision to grant an equitable remedy unless the court abuses its discretion when granting it. *See Bolinger v. Neal*, 259 P.3d 1259, 1268 (Colo. App. 2010). A court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, *Schneider v. Drake*, 44 P.3d 256, 261 (Colo. App. 2001), or if it is based on an erroneous understanding or application of the law, *Makeen v. Hailey*, 2015 COA 181, ¶ 25.

¶ 16    Easements may be express or implied.  *Lobato*, 71 P.3d at 950. To establish her claim for an easement by estoppel, the lessee had to prove three things:

- The board allowed the lessee to use the trust parcel road "under circumstances in which it was reasonable to foresee that [the lessee] would substantially change [her] position believing that the permission would not be revoked." *Id.* at 950-51 (quoting Restatement (Third) of Prop.: Servitudes § 2.10(1) (Am. L. Inst. 2000)).

- The lessee "substantially changed position in reasonable reliance on that belief." *Id.*

- "[I]njustice c[ould] be avoided only by establishment of a servitude." *Id.*

¶ 17    "Whether the circumstances in a case involve representation and reasonable reliance giving rise to equitable estoppel are questions of fact." *Tarco, Inc. v. Conifer Metro. Dist.*, 2013 COA 60, ¶ 39.  In a bench trial, it is the trial court's "sole province" to resolve disputed factual issues and to determine the witnesses' credibility, the weight to accord their testimony, and the inferences to be drawn from the evidence.  *In re Estate of Owens*, 2017 COA 53, ¶ 22.

Unless clearly erroneous, appellate courts are bound to accept a trial court's findings of fact. *Kruse v. Town of Castle Rock*, 192 P.3d 591, 603 (Colo. App. 2008). A finding of fact is clearly erroneous if there is no evidence in the record to support it. *Jordan v. Panorama Orthopedics & Spine Ctr., PC*, 2013 COA 87, ¶ 13, *aff'd*, 2015 CO 24.

¶ 18 Citing *Jehly v. Brown*, 2014 COA 39, ¶ 8, the board submits that the first contention before us — whether the lessee relied and could reasonably rely on Mr. Page's representations — is actually a mixed question of fact and law. We should, the board continues, therefore review the court's factual findings for clear error but review the "court's application of the governing legal standards" de novo. *Id.* (quoting *Lawry v. Palm*, 192 P.3d 550, 558 (Colo. App. 2008)).

¶ 19 We disagree because this is the wrong standard of review. *Jehly* involved a request to review a judgment entered after a trial to the court, and mixed-question review is de rigeur for such an issue. *See Lawry*, 192 P.3d at 558. The issue in this case is whether the court erred by granting the lessee an easement by estoppel, and, as we have shown above, abuse-of-discretion review applies. The

question of whether the court misapplied the governing legal standard, meaning the law defining the three components of an easement by estoppel, is part of our abuse-of-discretion review.

¶ 20     As far as the board's second contention — whether the board's constitutional and statutory authority barred the lessee's easement by estoppel claim — is concerned, we will review that claim de novo. *Cf. City & Cnty. of Denver v. Bd. of Cnty. Comm'rs*, 2024 CO 5, ¶ 26 ("[T]he interpretation of a statutory provision addressing when a claim accrues is an issue of law that we review de novo.").

¶ 21     Turning to the board's third contention — whether a section of Colorado's Governmental Immunity Act barred the lessee's equitable estoppel claim because, according to the board, it could lie in tort — we will review the court's factual findings for clear error and the issue of the board's governmental immunity de novo. *See City of Arvada ex rel. Arvada Police Dep't v. Denver Health & Hosp. Auth.*, 2017 CO 97, ¶ 14.

### B.     First Contention: Did the Lessee Rely on Mr. Page's Representations and, if so, Was Her Reliance Reasonable?

¶ 22     Initially, the board submits that the court erred because the lessee did not rely on Mr. Page's statements.  Among other things,

the board points to the lessee's awareness that her permission to use the trust parcel road was conditioned on the lease that authorized the board to revoke its permission for her to use the road after providing her notice. Then, the board submits the court erred because, even if the lessee relied on Mr. Page's statements, her reliance was unreasonable.

¶ 23     We disagree.

### 1.     The Court's Factual Findings

¶ 24     After the bench trial, the court made a series of factual findings that are pertinent to the discussion of the board's first contention. For the purposes of this opinion, we will organize them in two categories.

¶ 25     First, the court made findings about Mr. Page's authority, about his relationship with other leaseholders and with the lessee, and about statements that he had made to the lessee. Second, the court made findings about access to the lessee's land via the two alternatives to the trust parcel road: Fall Creek Road and the Lot 97 easement.

¶ 26    After reviewing the record, we conclude that the record supports these findings.  We next summarize the findings that are pertinent to our analysis.

### a.    Mr. Page's Statements

¶ 27    The court found that the board relied "almost solely" on its field staff, such as district managers like Mr. Page, to handle its business with leaseholders of school trust property.  During his tenure, Mr. Page served as the lessee's sole source of contact with the board.  He handled "almost everything" with all the leaseholders in his district, including the lessee in this case.  In fact, he was the first district manager whom the board had entrusted to acquire property for the board.

¶ 28    He was very familiar with the trust parcel road.  He knew it was the only access road to the lessee's land and that the lessee's predecessors had used it.

¶ 29    Because the school trust parcel was one of the more important leases he managed, he had a lot of contact with the lessee.  He visited her about once a year, inspecting the parcel, and he communicated with her on the telephone and by mail.

¶ 30 Mr. Page thought that the lessee took "exceptional[]" care in her grazing practices on the school trust parcel and that she was in the "top one percent" of leaseholders. She treated the parcel as if it were her own, and she protected it from trespassers.

¶ 31 Mr. Page, like other district managers, had the authority to make recommendations to the board about the school trust property that he managed. According to Mr. Page, the board would place a manager's recommendations on the board's consent agenda, and it almost always approved them, including road access permits and rights of way. It was rare for the board to "have any issues" with items on the consent agenda.

¶ 32 Mr. Page knew about the lessee's plans to build structures on her land. He also thought that the trust parcel road was the only "feasible access" to her land because the surrounding terrain was so steep.

¶ 33 As we noted above, Mr. Page supported the lessee's 2003 application to the county to improve the trust parcel road. He thought that the effects of the improvements, such as reducing erosion, would benefit the school trust parcel.

¶ 34    Mr. Page also sent the lessee a letter in October 2000.  He complimented her on her stewardship of the school trust parcel, and, because the lessee had asked for one, he included an application for a road access permit with the letter.  The lessee never filed the application, and Mr. Page explained why at trial.

¶ 35    He said that the board always allowed leaseholders to gain access to their property through roads on school trust property.  He therefore told the lessee that she should not pay for a road access permit because it was "unnecessary," and it was "something that she already had."  He made this same recommendation to all the leaseholders in the district that he managed, and he never directed any of them to get a road access permit.  The court found that Mr. Page's testimony was credible.

¶ 36    As a result of these communications, the lessee decided not to apply for a road access permit, and there was "no question in her mind" that she could improve the trust parcel road so that she could build the structures on her land.  The court found the lessee's testimony to be credible, too.

¶ 37    In 2003, the board, through Mr. Page, approved the lessee's request to improve the trust parcel road by adding gravel and

13

culverts so that heavy equipment could gain access to the lessee's land. Mr. Page spoke with the lessee before the improvements, and he saw them afterward. The court wrote that, "as district manager," Mr. Page had provided the lessee with "permission to improve the road to use it for developing her [land]." The court found the lessee's testimony was credible when she said that she would not have built on her land if she had thought that there was "any question about her right" to use the trust parcel road.

¶ 38 Mr. Page testified about what the board would do about leaseholders' access to roads if the board sold school trust property. The court found it credible when he said that the board would instruct him to "[f]ind out what the issues were" for leaseholders when school trust property was sold. The board had him "issue an easement to a road access permit holder . . . so that they [would be] taken care of . . . because it was the only practical access to what the [lessees] needed." The board would charge a minimum of $5,000 for these easements, and it would not object to issuing an easement to a leaseholder at the closing of a sale of school trust property if the lessee "had an absolute need for access."

14

¶ 39    In the twenty years that Mr. Page worked for the board, the board had never rejected his recommendations to grant leaseholders road access permits, easements, or lease renewals.  He once told the lessee that the board was not in the habit "of taking away a good [leaseholder's] lease."  Had he been the manager when the board announced that it was going to sell the school trust parcel, he would have recommended that the board grant the lessee an easement to use the trust parcel road in exchange for $5,000.  He assured the lessee that, if the board decided to sell the school trust parcel, the board would "take care of her" at the closing of the sale and "give her an easement."

¶ 40    Mr. Page never told the lessee that she should apply for a road access permit or any other kind of right-of-way authorization.

b.    Alternative Access to the Lessee's Land

¶ 41    In the board's 2019 letter, it stated that it had granted the lessee permission to improve the trust parcel road because of damage to the bridge over the Fall Creek Road in 2000.  But the court found that there was not any evidence submitted at the hearing to indicate that the bridge had been damaged in 2000.  (As we stated above, the evidence showed that the bridge had been

15

washed away in the 1980s.)  And the court observed that there was no proof showing that the staff had based its decision to allow the lessee to improve the trust parcel road in 2003 on any putative damage to the bridge in 2000.

¶ 42     The 2019 letter marked the first time in the lessee's thirty-three year stewardship of the school trust parcel that anyone had informed her that the board might revoke her access to the trust parcel road.  So she started to look around for alternatives.  She received a bid of about $970,000 to build a road to her land from the Lot 97 easement.

¶ 43     The person who sent the lessee the 2020 letter cancelling the lease for the school trust parcel testified that it was his understanding that the lessee was only using the trust parcel road until she could rebuild the bridge over Fall Creek and build a road to her land.  But the court found that this understanding was "in error."  Rather, "neither the [lessee] nor any predecessor in interest historically used any road from Fall Creek."

¶ 44     The court also decided that there were significant impediments to gaining access to the lessee's land via Fall Creek Road or through the Lot 97 easement.

¶ 45    The court found that "the undisputed credible testimony" from the lessee and her expert was that building an access road from Fall Creek Road to the lessee's property was "not feasible due to the slopes and soils." The "relative impossibility" of building this road would be further burdened by much higher costs, some generated by rebuilding the bridge across Fall Creek.

¶ 46    Turning to a potential road across the Lot 97 easement, the court found that the cost of building a road to the lessee's land would be about $982,000. But to access the newly built road, the lessee would have to use another private road. The homeowners association that controlled this private road told the court that it would not authorize the lessee to use the private road because she was not a homeowner in the association.

c.    The Court's Findings of an Easement by Estoppel

¶ 47    Based on its factual findings, the court also found:

- The board had given the lessee permission to use the trust parcel road.

- The board's permission was given under circumstances making it reasonable to foresee that the lessee would substantially change her position by building structures

17

on her land with the belief that the board would not revoke its permission.

- The lessee changed her position by building those structures based on the reasonable belief that the board would not revoke its permission.

- The only way to avoid injustice would be to grant the lessee an easement by estoppel in the trust parcel road.

- The court was not ordering the board to grant the lessee a right-of-way; rather, the court was acting in equity when it created the easement by estoppel.

### 2. Analysis

¶ 48    We conclude, for the reasons we discuss below, that the court's factual findings support its determinations that the lessee relied on Mr. Page's statements and that her reliance was reasonable.  We further conclude that the court did not abuse its discretion when it granted the lessee an easement by estoppel because its ruling was not manifestly arbitrary, unreasonable, or unfair and because it was not based on an erroneous understanding or application of the law.

### a. The Court's Findings Were Supported by the Record

¶ 49 We conclude there is evidence in the record that supports the findings the board disputes. Here are some illustrative examples.

¶ 50 The board submits that the court erred when it decided that the lessee's land would be landlocked if the lessee could not use the trust parcel road. But the board does not cite any part of the record contradicting the court's findings that other points of access — specifically via Fall Creek Road and through the Lot 97 easement — were untenable. For example, the record supports the trial court's findings that (1) the board was mistaken in its 2019 assumption that the lessee only wanted to use the trust parcel road until she could build a road to her land via Fall Creek Road, and (2) the lessee could not gain access to her land through the Lot 97 easement.

¶ 51 The board asserts that, contrary to the court's finding, its expert provided testimony at trial indicating that building an access road to the lessee's land via Fall Creek Road would have been feasible. But our review of the record indicates that this expert said that he had never made such an assessment.

¶ 52    The board disputes the court's finding that the board was misinformed about the lessee's desire to use the trust parcel road only until she could build an access route from Fall Creek Road. But we see the same evidence that convinced the court that the board was misinformed.  The 2019 letter states, without support elsewhere in the record, that the bridge washed away in 2000, when it was apparently actually washed away in the 1980s.  And there was no proof that the lessee, or any of her predecessors in interest, had ever used Fall Creek Road.

¶ 53    Addressing the lessee's 2003 letter to the county, the board asserts that the lessee knew that her land was not landlocked.  In support of its position, the board emphasizes that, in 2003, the lessee's application to the county to improve the trust parcel road identified two alternative means of access: Fall Creek Road and the Lot 97 easement.

¶ 54    But the lessee testified that that she was simply "covering all the bases" when she provided this statement to the county because she was confident that she would be able to access her land using the trust parcel road.  While the lessee indicated to the county that, under the lease, the board could rescind or limit her access to that

road, she also wrote in the 2003 application that she thought she could show that the road was public. And, most importantly, the board's assertion avoids the court's findings that building a road to the lessee's land from Fall Creek Road would be extremely difficult and that constructing an access road through the Lot 97 easement would be blocked by the homeowners association, denying the lessee access to any road that she might construct.

¶ 55 Even if there are facts in the record to support all the court's findings, the board submits that we should, after reviewing all the evidence, nonetheless reach the "firm and definite conviction that a mistake has been made." *Indian Mountain Corp. v. Indian Mountain Metro. Dist.*, 2016 COA 118M, ¶ 31. The board says that this is because the court's findings were contradicted by documentary and other evidence. *See id.* at ¶ 33.

¶ 56 We disagree. As we indicated above, the court's order was thorough and detailed, laying out the evidence supporting its findings. While there was conflicting evidence, we cannot reach a firm and definite conviction that the court made a mistake in those findings. This is particularly true because the court found that the

lessee and Mr. Page were credible when they testified about certain pivotal facts. *See In re Estate of Owens*, ¶ 22.

b. The Lessee Relied on Mr. Page's Statements

¶ 57 The board submits that the lessee did not rely on Mr. Page's statements because her permission to use the trust parcel road arose from the lease and because she knew, based on the lease's terms, that the board could revoke her permission to use the road. But the issue before the court was not solely what was in the lease; it also concerned whether the lessee believed that her permission to use the trust parcel road would not be revoked. And the question of whether the lessee relied on Mr. Page's statements was a question of fact. *See Tarco, Inc.*, ¶ 39.

¶ 58 We begin by noting that the lease did not expressly address the board's authority to revoke the lessee's access to the trust parcel road or what would happen to her access if the board canceled the lease. The board also knew that the lessee had financed the improvements of the road to allow her to build structures, including a residence, on her land. So the board was aware that she had changed her position by increasing her reliance on the road to access those structures. Revoking her access to the

22

road after she had improved it and built those structures would disadvantage her more than if the board had revoked her access before the improvements.

¶ 59     The court considered abundant evidence, including the lessee's testimony and Mr. Page's testimony.  This testimony supplemented the court's understanding of how the lease had been managed, and it added clarity about how the *board itself* relied on its district managers and how it awarded easements to leaseholders when it sold school trust property.  As a result, the court clearly considered the lease (and the lessee's 2003 letter), including Mr. Page's and the lessee's testimony about them.  We conclude that the record supports the court's finding that, while the lessee "may have been aware that the [b]oard had the general authority to revoke a [leaseholder's] access, she reasonably believed that the [b]oard would not exercise such authority over her" based on her experience with the board and on Mr. Page's statements.

c.     The Lessee's Reliance on Mr. Page's Statements Was Reasonable

¶ 60     The board asserts that the lessee relied unreasonably on Mr. Page's statements because he was merely stating his own opinion,

23

not the board's policy, and because he exceeded his authority as the district manager when he made those statements. For example, Mr. Page

- told the lessee that it was unnecessary for her to apply for a road access permit for the trust parcel road because she should not pay for something that she already had;

- testified that, when the board sold school trust property, there was direction from the board to sell easements to leaseholders so that they could maintain the practical access they needed;

- said that the board would not object to issuing such an easement if there was an absolute need for one;

- added that, during his tenure, the board had never declined to approve an easement or a road access permit that he had recommended; and

- informed the lessee that, because she had been such a good steward of the school trust parcel, she would not lose her lease to that parcel unless the board sold the

24

parcel, and, if it did, then the board would give her an easement to the trust parcel road.

¶ 61 We conclude, for the following reasons, that the record supports the court's finding that the lessee reasonably relied on Mr. Page's statements.

¶ 62 The court found that Mr. Page had implied actual authority to inform the lessee about the likelihood of her continued access to the trust parcel road and to bind the board by his representations. As our supreme court observed in *State Farm Mutual Automobile Insurance Co. v. Johnson*, "[a]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." 2017 CO 68, ¶ 21 (quoting Restatement (Third) of Agency § 2.01 (Am. L. Inst. 2006)). Actual authority is based upon "a principal's expressive conduct toward an agent, through which the principal manifests assent to be affected by the agent's action, and the agent's reasonable understanding of the principal's manifestation." Restatement (Third) of Agency § 2.01 cmt. c. The

scope of an agent's actual authority is generally a question of fact. *Fresquez v. Trinidad Inn, Inc.*, 2022 COA 96, ¶ 14.

¶ 63 In disagreeing with the court, the board submits that Mr. Page did not have authority to grant future or permanent access rights on school trust property: doing so was solely the board's prerogative. The board points to the court's order, which recognized that the board had sole authority to grant express rights of way. And then the board cites cases such as *Kruse*, 192 P.3d at 604, and *Department of Transportation v. First Place, LLC*, 148 P.3d 261, 267 (Colo. App. 2006), for the propositions that a person may not rely on the opinions of a government agent or on representations of government agents that are inconsistent with the law.

¶ 64 These propositions are obviously true as far as they go, but the trial court, with support in the record, determined that Mr. Page was speaking to the lessee about the board's practices, not about his independent opinion, and that he was not acting outside of the scope of his employment when he made the statements to the lessee. Rather, the court determined, based on Mr. Page's testimony and on the historical context of the use of the trust parcel road, that he "did not act outside his authority by conveying his

*understanding* of the [board's] historical practices based on his many years of experience and recommendations." Indeed, when discussing the board's conduct in 2000, Mr. Page's "testimony was consistent with then-existing [b]oard policies."

¶ 65    A witness for the board testified that the board did not have a policy concerning granting leaseholders access to school trust property when the board sold it. The court's finding that, based on Mr. Page's testimony, the granting of easements to such leaseholders was a common practice at the time did not contradict the board's testimony. And, pointing to Mr. Page's knowledge of the board's conduct, the court noted that he was a longtime employee who had extra duties, including property acquisitions. Looking at the board's knowledge of Mr. Page's conduct, the court found that it was "not uncommon for access issues to arise at the local level and for district managers to speak with adjacent [leaseholders] about those issues."

¶ 66    The court also relied on facts in the record to decide that, even if Mr. Page did not have actual authority to inform the lessee about the likelihood of her future ability to use the trust parcel road, he had apparent authority. Apparent authority is established by proof

of "written or spoken words or other conduct of the principal which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his behalf by a person purporting to act for him." *Lucero v. Goldberger*, 804 P.2d 206, 209 (Colo. App. 1990). "The issue of apparent authority is generally an issue of fact to be determined by the trial court." *Rush Creek Sols., Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo. App. 2004).

¶ 67　　The court reasoned that, by placing Mr. Page, as a district manager, in charge of working with leaseholders, the board, either intentionally or negligently, put him in a position to express its will to the leaseholders. The court added that no one associated with the board, aside from Mr. Page, was familiar with the board's historical interactions with the school trust parcel.

¶ 68　　The board next submits that the lessee's reliance on Mr. Page's statements was not reasonable because she was "sophisticated in real estate matters." But this submission ignores the court's factual findings about the reasonableness of the lessee's beliefs based on Mr. Page's statements.

¶ 69　　Last, the board states that the court could not rely in its order upon the historical patterns of usage of the trust parcel road by the

lessee's predecessors. The board continues that there was no evidence in the record that the predecessors had any right of access to the road outside of the access granted by their leases and that the lessee's "commendable" stewardship of the school trust parcel did not amend her lease.

¶ 70 But the court considered evidence that, for at least one hundred years, leaseholders were allowed to use the trust parcel road and permission to do so had never been revoked. This factor was only one of the many listed above addressing the reasonableness of the lessee's reliance on Mr. Page's statements.

C. Second Contention: Did the Board's Constitutional and Statutory Authority Bar the Lessee's Easement by Estoppel Claim?

¶ 71 The board contends that its constitutional and statutory authority barred the lessee's easement by estoppel claim because the board is the sole authority that may grant rights-of-way over school trust property. We are not persuaded.

¶ 72 The board is an agency of the State of Colorado. *See* Colo. Const., art. IX, § 10(1) (authorizing creation of the board). It has the power to grant rights-of-way and easements on the property that it administers. *See* § 36-1-136, C.R.S. 2024.

29

¶ 73    But, contrary to the board's suggestion, the law in the preceding paragraph did not bar the court from forging an equitable remedy in this case.  Indeed, estoppel may be asserted against governmental agencies.  *Tarco, Inc.*, ¶ 39.

¶ 74    Statutes "may not be interpreted to abrogate the common law unless such abrogation was clearly the intent of the General Assembly."  *Argus Real Est., Inc. v. E-470 Pub. Highway Auth.*, 109 P.3d 604, 611 (Colo. 2005) (quoting *Preston v. Dupont*, 35 P.3d 433, 440 (Colo. 2001)).  There is nothing in either Colorado Constitution, article IX, section 10, or in section 36-1-136 that exempts the board from equitable remedies.  *See Martinez v. Colo. Dep't. of Hum. Servs.*, 97 P.3d 152, 159 (Colo. App. 2003) (Absent an express statutory statement, a court "may not infer that the General Assembly has abrogated otherwise applicable common law or equitable remedies.").  And, as we have observed above, an easement by estoppel is an equitable remedy.  *Lobato*, 71 P.3d at 951.

¶ 75    It is important to focus on what the court did.  Contrary to the board's suggestion, the court did not order it to issue an easement

or a right-of-way to the lessee.  Instead, the court decided that an easement by estoppel was available under the common law.

### D. Third Contention: Does Colorado's Governmental Immunity Act Bar the Lessee's Equitable Estoppel Claim?

¶ 76    The board contends that Colorado's Governmental Immunity Act, which we shall call "the Act," immunizes it from the lessee's easement by estoppel claim.  We disagree.

#### 1. Standard of Review and Relevant Law

¶ 77    "A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant . . . ." § 24-10-106(1), C.R.S. 2024 (version effective until Jan. 1, 2025).  Whether a party has suffered an injury and whether the claim could lie in tort are two separate questions, which require separate inquiries.  *Open Door Ministries v. Lipschuetz*, 2016 CO 37M, ¶ 16.

¶ 78    "Whether a particular claim lies in tort or could lie in tort within the meaning of the [Act] depends on the factual basis underlying the claim." *City of Aspen v. Burlingame Ranch II Condo. Owners Ass'n*, 2024 CO 46, ¶ 30.  "[A] claim that is supported by

allegations of misrepresentation or fraud is likely a claim that could lie in tort." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1005 (Colo. 2008). But the Act does not bar claims for prospective relief to prevent future injury. *Open Door,* ¶ 17.

### 2. Analysis

¶ 79 We conclude, for the following reasons, that the board was not immune under the Act from the lessee's claim.

¶ 80 The board asserts that, because the lessee did not file her complaint until after the board decided to cancel her lease, she suffered a past injury that falls under the Act, rather than a "future injury" that is beyond the Act's coverage. The record refutes this assertion.

¶ 81 When the lessee filed her claims, and by agreement of the parties throughout this case, she has maintained permission to use the trust parcel road. So the injury to be caused by the board's decision to revoke its permission for the lessee to use the trust parcel road has yet to occur. *See Open Door,* ¶ 26 (concluding that, because the plaintiff was still conducting the same activities, it had not yet been injured).

¶ 82    The board next submits that the lessee's claim could lie in tort because it was based on misrepresentations that Mr. Page had made. This means, the board goes on, that her claim was the sort of equitable estoppel claim that could lie in tort and was, therefore, barred by the Act. *See Bd. of Cnty. Comm'rs v. DeLozier*, 917 P.2d 714, 716-17 (Colo. 1996).

¶ 83    In support of this submission, the board cites *Lehman v. City of Louisville*, 857 P.2d 455, 456 (Colo. App. 1992), in which the plaintiffs' estoppel claim alleged that they had relied, to their injury, on misrepresentations made by a city official, and they sought damages. The division concluded that the claim was a tort for the purposes of the Act.

¶ 84    But the court found that Mr. Page had not made any misrepresentations; rather, it found that he was credible and that he had accurately described the board's then-existing practices to the lessee. So the court concluded that the lessee's claim was not the sort of equitable estoppel claim described in *Lehman* but akin to a promissory estoppel claim, which lay in contract, *see DeLozier*, 917 P.2d at 716-17. Such claims are not barred by the act. *See id.* And, unlike in *Lehman*, the lessee did not seek compensatory

33

damages; she only asked the court for equitable relief. *See City of Colorado Springs v. Conners*, 993 P.2d 1167, 1174 (Colo. 2000)("[C]laims best characterized as equitable and non-compensatory in nature" do not lie in tort, nor could they lie in tort, for the Act's purposes.).

¶ 85 The judgment is affirmed.

JUDGE SCHOCK and JUDGE HAWTHORNE concur.